J-S51018-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| BRUCE KENNETH WOODS, JR. | |
| Appellant | No. 1369 EDA 2014 |

Appeal from the Judgment of Sentence January 6, 2014
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0003123-2011

BEFORE:  GANTMAN, P.J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:                **FILED OCTOBER 02, 2015**

Bruce Kenneth Woods, Jr., appeals from his judgment of sentence, imposed in the Court of Common Pleas of Montgomery County, after entering an open guilty plea to third-degree murder (F-1),[1] robbery (F-1),[2] solicitation to commit perjury (F-3),[3] and related offenses.  Woods was sentenced to an aggregate term of 25-50 years' imprisonment.  After careful review, we affirm on the basis of the opinion authored by the Honorable Thomas C. Branca.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(c).

[2] 18 Pa.C.S. § 3701(a).

[3] 18 Pa.C.S. § 4902; 18 Pa.C.S. § 906.

In October 2010, on the streets of Norristown, Woods gunned down the victim by firing multiple shots from a semiautomatic 9mm handgun. Woods had agreed to murder the victim in exchange for $10,000 from his co-conspirator, Tyuan Simon, who told Woods that the victim had "ratted him out" to police. Just moments before the "murder-for-hire," Woods assaulted a female victim, stealing her gun, which he then used to shoot the victim.

Woods signed a proffer with the Commonwealth, in which he provided a detailed statement of his involvement in the victim's murder in exchange for the Commonwealth charging him with third-degree murder instead of seeking the death penalty.[4] Woods entered an open guilty plea to various charges and was sentenced to the following consecutive terms of imprisonment: 17-34 years for third-degree murder; 6-12 years for robbery; and 2-4 years for solicitation (perjury).[5] Woods filed post-sentence motions that were denied. This timely appeal followed.

On appeal, Woods presents the following issues for our consideration:

_____

[4] The Commonwealth initially charged Woods with capital murder. *See* 18 Pa.C.S. § 2502(a).

[5] Woods also pled guilty to conspiracy to commit third-degree murder, robbery (decedent), person not to possess a firearm, and simple assault. Those sentences were ordered to run concurrent to the above-stated charges.

(1)    Is a sentencing scheme of consecutive standard range sentences an abuse of discretion where said scheme is based on facts not of record?

(2)    Did the sentencing court commit an abuse of discretion in failing to impose a mitigated sentencing scheme in light of Appellant's substantial cooperation with the Commonwealth, his receipt of physical/verbal threats, and his horrendous life story?

Based on the multiple crimes with which he was charged, Woods faced a maximum aggregate sentence of 77-154 years' imprisonment. Moreover, if Woods chose to proceed to trial, imposition of the death penalty was a possibility. Although the court ran Woods' murder, robbery and solicitation (perjury) sentences consecutively, each of these sentences was in the standard range of the guidelines. Additionally, the court chose to impose concurrent sentences on the remaining five charges.[6]

After carefully reviewing the parties' briefs, the record on appeal, and relevant case law, we affirm Woods' judgment of sentence based upon the well-written and thorough opinion authored by Judge Branca. We instruct the parties to attach a copy of Judge Branca's decision in the event of further proceedings in the matter.[7]

_____

[6] Woods simultaneously entered an open guilty plea to possession with intent to deliver on a separate bill.

[7] While Woods' claims challenging the court's imposition of consecutive, non-mitigated range sentences may not present a substantial question in some cases, we find that his overarching claim that the court used improper facts in imposing his sentence does invoke our appellate review of his claims. *See Commonwealth v. Marts*, 889 A.2d 608 (Pa. Super. 2005) (bald claim of excessiveness of sentence due to consecutive nature of sentence will not

*(Footnote Continued Next Page)*

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/2/2015

---

*(Footnote Continued)* ─────────────

raise substantial question), and **Commonwealth v. Johnson**, 961 A.2d 877 (Pa. Super. 2008) (claim that sentencing court did not consider adequately certain mitigating factors does not raise substantial question), **but see Commonwealth v. Moury**, 992 A.2d 162 (Pa. Super. 2010) (defendant may raise substantial question where he receives consecutive sentences within guideline ranges if case involves circumstances where applying guidelines would be clearly unreasonable and result in excessive sentence); **Commonwealth v. Wright**, 600 A.2d 1289 (Pa. Super. 2000) (where defendant contended sentencing court failed to consider special circumstances of case and that imposition of standard-range sentence indicates court's failure to consider mitigating factors, substantial question raised).

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    :                    NO. 3123-11, .
                                :                    1369 EDA 2014
                v.              :
                                :
BRUCE KENNETH WOODS, JR.        :

## OPINION OF THE COURT

**Branca, J.**                                           **December 16, 2014**

### I.    INTRODUCTION

Defendant, Bruce Woods ("Defendant"), appeals to the Superior Court from the

judgment of sentence imposed by this Court on January 6, 2014. Defendant claims that the

Court erred by denying his Post-Sentence Motion, wherein he sought to have his sentence for

a third degree murder charge reduced to a mitigated range sentence, and sentences for

robbery[1] and solicitation to commit perjury[2] run concurrently rather than consecutively. For

the reasons that follow, Defendant's appeal is without merit.

### II.   STATEMENT OF THE CASE

####    A.   Factual and Procedural History

On Tuesday, October 19, 2010 at 10:00pm, Officers from the Norristown Police

Department responded to 1120 Swede Street to find the lifeless body of Tyree Whiting (the

"victim"), who had been shot multiple times. Less than an hour earlier that evening

Defendant was at a local bar, Uptown's Roo House Tavern, located at 1040 Willow Street in

Norristown. While at the bar Defendant began talking to Tyuan Simon ("Simon"). Simon

claimed that the victim, who was also at the Roo House at that time, had 'ratted him out' to

---

[1] Count 5 of Bill of Information 3123-11.
[2] Count 11 of Bill of Information 3123-11.

1

police and as a result Simon "had a dime"[3] on the victim's head.[4] Defendant immediately agreed, accepting Simon's solicitation to kill the victim.

According to video surveillance later retrieved by police, the victim left the bar at 9:46pm and headed down Willow Street towards Spruce Street.[5] Defendant who was already outside waiting for the victim immediately pursued him. As outlined in the Affidavit of Probable Cause, and testified to by Defendant at Simon's murder trial, Defendant later recounted the following chilling details:[6]

> Q: So what happened when you caught up to Tyree Whiting at the corner of Lincoln and Swede?
>
> A: I pulled out my gun. And immediately he went in his pockets and everything and handed me a baggie and some money. And he tried to give me his phone and I told him I didn't need his phone.
>
> Q: Why did you tell him that you didn't need his phone?
>
> A: I wasn't there to rob him.
>
> Q: Why not?
>
> A: I was there to kill him, I didn't need nothing from him.
>
> . . .
>
> Q: What was his reaction when you said that Philly didn't need his phone?
>
> A: He ran. He started running.

[N.T. 3/13/14, at PTM-Exhibit 4, at 22-26]. The victim only made it about 15 feet before Defendant gunned him down with two shots from a Ruger semiautomatic 9mm handgun.

---

[3] Defendant would later testify that he understood Simon to be saying that he would pay $10,000.00 to the person who would agree to kill the victim. [Id. at 16].

[4] [N.T. 1/6/14, at DS-1, "Criminal Complaint, Tyuan Simon," "Affidavit of Probable Cause," at 13-14];[ N.T. 3/13/14, at PTM-Exhibit 4, at 15].

[5] [N.T. 1/6/14, Ex. DS-1, Affidavit at 8].

[6] The testimony attached to Defendant's Post-Sentence Motion from Simon's jury trial is consistent with the Affidavit, admitted as Ex. DS-1 at Defendant's sentencing, and served as a basis for his plea. [Def.'s PTM, Ex. 4, at 22-26]; [N.T. 1/6/14, at 42, Ex. DS-1, Affidavit at 13-14].

Once the victim was down on the ground Defendant testified that he "went over top of him and shot him some more." [Id. at 26].

> Q: How many times did you shoot him after that?
>
> A: I really don't know the count offhand. I just fired until he stopped moving.
>
> Q: Why did you keep firing at him until he stopped moving?
>
> A: To get the job done, so I could collect the money."

[Id. at 26-27]. The Commonwealth also elicited the following telling testimony from Defendant during his co-Defendant, Simon's trial:

> Q: Now, I just want to see if I can get this straight. How long did your conversation with the Defendant [Simon] last in the Roo House that night?
>
> A: Probably no more than five, seven minutes.
>
> Q: Five, seven minutes?
>
> A: Yeah. Probably not even that.
>
> Q: And how was it that after a five to seven minute conversation, that you agreed to kill another man?
>
> A: He said he was a rat. And code of the streets, he ain't 'posed to be around here walking around.
>
> Q: What's the code of the streets?
>
> A: The rat got to die.

[N.T. 3/13/14, at PTM-Exhibit 4, at 34-35].

On October 20, 2010, less than 24 hours after the murder, police took Defendant into custody after apprehending him on a state parole warrant. [N.T. at 1/6/14, at 7]. Defendant provided a detailed statement to authorities, consistent with the Affidavit of Probable Cause and the above-referenced testimony.

3

[N.T. 1/6/14, DS-1, Affidavit, at 13-14].

Ultimately, the Commonwealth charged Defendant with capital murder,[7] and a number of associated crimes. On June 4, 2012, Defendant signed a proffer agreement wherein he agreed to cooperate with the Commonwealth in its investigation of his co-Defendant, Simon, and provided a detailed confession as to the murder of the victim. [N.T. 8/1/12, at Ex. D-2]. On August 1, 2012, Defendant, who faced potential imposition of the death penalty if found guilty, entered an open guilty plea to a number of charges including third degree murder, conspiracy, and robbery, in addition to several other crimes.[8] Defense Counsel conducted an extensive and detailed colloquy to ensure Defendant understood the specific elements and factual basis as to each charge to which he was pleading guilty and the specific maximum sentences to which he was subject. [N.T. 8/1/12, at 14-19].

At the time of his sentencing, Defendant faced the potential imposition of a maximum sentence of seventy-seven (77) to one hundred fifty-four (154) years of incarceration if sentenced consecutively on the charges to which he pled guilty. [N.T. 8/1/12, at 3-4, 13]. During his plea, Defendant also affirmed that he understood sentencing "would be up to the Judge." [N.T. 8/1/12, at 13]. The undersigned deferred sentencing and ordered that a pre-sentence investigation ("PSI") be conducted.[9] At sentencing on January 6, 2014, the Court reviewed the previously requested PSI, a lengthy mitigation report[10] submitted by Defendant, heard and considered testimony produced by both Defendant and the Commonwealth; and

---

[7] 18 Pa. C.S. § 2502(a).
[8] [N.T. 8/1/12, at 22]. Defendant simultaneously entered an open guilty plea to Count Two-possession with intent to deliver, on Bill of Information 7823-2010.
[9] See PSI attached hereto as a Sealed Exhibit.
[10] As Defendant was originally facing the imposition of the death penalty, Defense Counsel previously moved for additional financial resources to enlist the expertise of Louise Luck, M.A. who submitted a 10-page Multi-Generational Capital Mitigation Report, admitted at the sentencing hearing as Exhibit DS-2.

4

considered Defendant's allocution statement. The Court also inquired of counsel if there were any objections, additions or corrections that they wished to make to the PSI, to which Defense Counsel replied in the negative. [N.T. 1/6/14, at 5-6] (Defense Counsel: "No, your Honor. We're in agreement with those. And we've had a chance to otherwise review it, and we have no additions or other corrections.").[11]

Prior to imposing sentence the Court stated with specificity its analysis of the aggravating and mitigating circumstances.

> This case requires the Court to balance a number of factors in fashioning a sentence. I don't think that there's anybody here, or anybody who knows of Mr. Woods' background, and reads all that I have been provided in terms of his life, who would be surprised that Mr. Woods ended up where he now is. Nobody. He has virtually known nothing from the beginning of his life but physical violence, abuse, drugs, life on the street. He's spent his entire childhood essentially as a vagabond, though he was in some juvenile facilities. He has had little to no education of any kind, no parental guidance of any kind or support of any kind. And then he basically spent his entire adult life in prison. So his exposure to this world, and what he was taught and seen, it doesn't surprise me that he is where he is.
>
> On the other side, of course, we have a cold-blooded murderer, a murder for hire. An act that could have resulted, realistically, in the imposition of the death penalty, and certainly in the imposition of a mandatory life sentence. And one of the questions that -- and I think Mr. Steele raised it, but I certainly thought about myself -- is what this term means. What Mr. Woods agreed to do in terms of cooperating and testifying -- at no doubt some significant danger to himself -- whether it was simply motivated to avoid the death penalty, or life in prison, or whether, as part of his motivation, it's become a defining moment of change in his life. I think I'd be foolish to say that it's only a defining moment of change in his life. There is no question that he was motivated to avoid the death penalty and a mandatory life sentence. No question about that. But at least it seems, to some extent, to me that it may be a defining moment in his life to change. He certainly has taken responsibility for his actions. And there seems to be at least some mindset, as I just heard, that he's not blaming anybody else.
>
> This case involves an individual who society has failed. It seems to me that, to some extent, our juvenile system failed, our penal system, adult penal

---

[11] For its part, the Commonwealth did note one typographical oversight regarding Defendant's prior criminal history and in particular a sentencing date of January 10, 2002. [N.T. 1/6/14, at 4].

5

system, failed. Because they were the structures that he most had. But I suspect that he was significantly lost by the time he even got exposed to them.

But Mr. Woods seems to be a man who has the strength to stand up on his own. And most significantly, he failed himself. And he became and was a significant threat to society, to the point of committing a number of violent crimes; and ultimately to commit, as I said, a cold-blooded murder.

So the task for this Court is to try to balance out all of those competing considerations. And I asked myself, as I was preparing for this, what responsibility the Court has to encourage others to cooperate in violent crimes. And I think there is no question but we need to do that. And I think the Commonwealth recognized that need and acted responsibly to encourage cooperation, by agreeing to take a plea to third degree murder.

A number of years back, I had a third degree murder plea that I imposed the maximum sentence for, because I told the defendant at the time, you got your break. Because, otherwise, I viewed the case as a first degree murder case all the way. That defendant, of course, was not about to cooperate and testify.

So while Mr. Woods has gotten a significant break, obviously, in this agreement to the third degree murder case, he has cooperated. And I am going to take that into further consideration in my sentence.

I am, however, persuaded by the Commonwealth's argument that there are other crimes here that need to be addressed separately. One is the robbery of Ms. Davis, which is unrelated to the murder. And yet another violent crime, the facts of which are incredibly disturbing. And the second is the perjury subordination, which I think this Court has an obligation to send out a message that that will not be tolerated either.

So I've considered all those factors, and I've considered all of the information provided to me in the presentence report, and all of the information provided to me in this mitigation report submitted by the defense. And for all those reasons and everything that I've stated on the record, I am imposing the following sentence.

[N.T. 1/6/14, at 53-57].

Thereafter, the undersigned sentenced Defendant to undergo imprisonment for an aggregate of twenty (25) to fifty (50) years. More specifically, he was sentenced as follows: on Bill of Information 3123-11: Count Three- murder in the third degree, 17-34 years of imprisonment; Count Five-robbery, 6-12 years of imprisonment to run consecutively to

6

Count Three; Count Eleven- solicitation to commit perjury, 2-4 years of imprisonment to run consecutively to Count Five, with his remaining sentences to run concurrent to Count Five. [N.T. 1/6/14, at 58-61]. Additionally, on Bill of Information 7823-10, Defendant was sentenced on Count Two- possession with the intent to deliver a controlled substance, to 1-2 years of imprisonment to run concurrent to his above-referenced sentence. Each of the sentences imposed by the Court were the low end of the standard range as set forth in the Sentencing Guidelines.[12]

On January 16, 2014, Defendant filed a timely Post-Sentence Motion, in which he preserved his challenge to the discretionary aspects of the Court's sentence.[13] Despite the "significant mitigation," which Defendant acknowledged at sentencing he had already received from the Commonwealth in terms of the plea agreement terms, he now seeks reformation of his sentence on the primary charge, 3rd degree murder, to a mitigated range sentence. In addition, Defendant seeks to have his sentences on the other charges to which he pled guilty to run concurrently on all terms. [N.T. 1/6/ 14, at 45]. As a basis for his claim, Defendant contends that the Court failed to "sufficiently consider" Defendant's cooperation in the murder case and impermissibly considered factors outside of the record in imposing consecutive sentences on the other charges.

After hearing and argument, the Court denied Defendant's Motion by Memorandum and Order dated April 1, 2014. Thereafter, on May 1, 2014 Defendant filed a timely Notice of Appeal. On May 22, 2014, Defendant filed his Pa. R.A.P. 1925(b) Statement ("1925(b)

---

[12] See e.g., 42 Pa. C.S. § 9701 et seq.; see also, 204 Pa. Code § 303.1 et seq.
[13] See Commonwealth v. McAfee, 849 A.2d 270, 275 (Pa. Super. Ct. 2004).

7

Statement"), attaching thereto two exhibits, and setting forth the following for appellate

review:[14]

### III.  ISSUES PRESENTED

1.  The sentencing court's imposition of consecutive sentences totaling 8-16 years to the Court's sentence of 17-34 years for the crime of Third Degree Murder was not supported by the record at the guilty plea hearing on 8-1-12 or the sentencing hearing on 1-6-14 and 3-13-14, where said sentence was based upon incorrect factual assertions and impermissible considerations such as going outside the record of this case.

2.  The sentencing court improperly considered allegations from the Presentence Investigation Report to which appellant never admitted or pled guilty and which were never proven by proper evidence by the Commonwealth at either sentencing hearing.

3.  The sentencing court, in imposing consecutive time, improperly considered allegations pertaining to Count 11-Solicitation to Commit Perjury and Count 5- Robbery of Taliya Davis which were never proven in court or admitted to by Appellant.

4.  The sentencing court improperly relied upon unverified hearsay outside the record in deciding to impose consecutively the combined sentences of 8-16 years for the Taliya Davis robbery and the solicitation to commit perjury charges.

5.  The sentencing court committed an abuse of discretion, as a denial of due process of law, when it considered irrelevant factors during sentencing based on unproven hearsay allegations contained in the Presentence Investigation Report, to which Appellant timely objected in filing his Post-Sentence Motion.

6.  The sentencing court, in erroneously imposing consecutive sentences, and in failing to sentence Appellant within the mitigated range for Third Degree Murder, failed to sufficiently consider the facts that: (a) Appellants' testimony was critical to the Commonwealth's conviction of co-defendant, Tyuan Simon, (currently on Appeal indexed at 1161 EDA 2014), of First Degree Murder and related charges: (b) Appellant was constantly in fear for his life based on the threatening notes and physical attacks; and (c) Appellant's horrendous childhood which led him to develop damaging relationships with thugs like Tyuan Simon.

---

[14] Defendant attached copies of both his Post-Sentence Motion and Supplemental Memorandum in Support of Post-Sentence Motion, previously filed on January 16, 2014 and March 20, 2014, as Exhibit "A" and "B," respectively, to his Pa. R. A.P. 1925(b) Statement.

7. Appellant incorporates by reference as though fully set forth herein his Post-Sentence Motion pursuant to Pa. R.Crim. 720(B)(1)(a)(v) filed of record 1-16-14 (attached as Exhibit "A") and his Supplemental Memorandum in Support of the Post-Sentence Motion filed of record on 3-20-14 (attached as Exhibit "B").[15]

## IV.    DISCUSSION

### A. The Standard of Review

The Superior Court will not disturb a trial court's sentence absent an abuse of discretion or an error of law. *Commonwealth v. Perry*, 32 A.3d 232 (Pa. 2011). The rationale supporting this deferential standard of review is that the sentencing court is "in the best position to view the defendant's character, displays of remorse, defiance, or indifference, and the overall effect and nature of the crime." *Commonwealth v. Allen*, 24 A.3d 1058, 1065 (Pa. Super. Ct. 2011)(internal citation omitted). In evaluating a trial court's decision, an "abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. Greer*, 951 A.2d 346, 355 (Pa. 2008) (internal quotation omitted).

To invoke appellate jurisdiction, a defendant challenging the discretionary aspects of a sentence must satisfy a four-part test including the following inquiries:

(1) whether appellant has filed a timely notice of appeal, *see* Pa. R.A.P. 902 and 903;
(2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa. R.Crim.P. 720;
(3) whether appellant's brief has a fatal defect, Pa. R.A.P. 2119(f); and
(4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

---

[15] Defendant attached his Post-Sentence Motion and his Supplemental Memorandum in Support thereof.

9

Commonwealth v. Griffin, 65 A.3d 932, 935 (Pa. Super. Ct. 2013). Once a defendant overcomes the initial procedural hurdles of the above-stated test, the appellate court's attention shifts to determine whether he has asserted the requisite substantial question. "The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." *Id.* (internal citation omitted). A substantial question exists "only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Id.* (internal citation omitted); *see* 42 Pa. C. S. § 9781.[16]

Furthermore, when the sentence imposed is within the Pennsylvania Sentencing Guidelines, the appellate court will substitute its judgment "only if application of the guidelines is clearly unreasonable." *Commonwealth v. Macias*, 968 A.2d 773, 777 (Pa. Super. Ct. 2009). Additionally, when the sentencing court has the benefit of a PSI, the appellate court will presume that it was aware of the relevant information regarding a defendant's character, as well as other relevant facts, and that it weighed those considerations appropriately with any other mitigating factors. *Commonwealth v. Griffin*, 65 A.3d 932, 937

---

[16] Title 42, Section 9781 also states:
**(c) Determination on appeal.**--The appellate court shall vacate the sentence and remand the case to the sentencing court with instructions if it finds:
(1) the sentencing court purported to sentence within the sentencing guidelines but applied the guidelines erroneously;
(2) the sentencing court sentenced within the sentencing guidelines but the case involves circumstances where the application of the guidelines would be clearly unreasonable; or
(3) the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable.
In all other cases the appellate court shall affirm the sentence imposed by the sentencing court.
**(d) Review of record.**--In reviewing the record the appellate court shall have regard for:
(1) The nature and circumstances of the offense and the history and characteristics of the defendant.
(2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.
(3) The findings upon which the sentence was based.
(4) The guidelines promulgated by the commission.

10

(Pa. Super. Ct. 2013). Finally, it is well-settled that the Court has wide discretion to impose consecutive sentences. 42 Pa. C.S. § 9721(a); *Commonwealth v. Mastromarino*, 2 A.3d 581, 586-87 (Pa. Super. Ct. 2010) (Recognizing the long-standing statutory precedent which affords the sentencing court discretion to impose its sentences consecutively.).

## B.     The Court's Sentence Was Wholly Appropriate.

On appeal, Defendant challenges discretionary aspects of the Court's sentence. While conceding that the sentences imposed were legal, Defendant contends the Court erred by not giving sufficient consideration to Defendant's cooperation in the murder case, namely his agreement to testify against the individual who "hired" him to kill the victim. Defendant's claim that this Court erred when it imposed the low end standard range sentence for the victim's murder and imposed consecutive low end standard range sentences for Defendant's robbery and solicitation to commit perjury charge is clearly unfounded, and frankly preposterous given the circumstances of the murder and other offenses.

*i. The Low End Standard Range Sentence Imposed For 3ʳᵈ Degree Murder Was Appropriate.*

With regard to Defendant's assertion that the Court should have sentenced him within the mitigated range for his 3ʳᵈ degree murder plea, it bears emphasis that Defendant initially faced the death penalty for the depravity of this murder. And while the Commonwealth ultimately opted to offer Defendant a plea to a reduced charge in exchange for his cooperation, the human toll resulting from the Defendant's calculated immorality remains unaltered. Even in the face of his cooperation, the commission of an otherwise first degree murder standing alone would be sufficient justification for the imposition of a standard range sentence. But when one considers that this was a cold-blooded murder-for-hire of a witness, a standard range sentence, let alone the low end of the standard range is extending more than sufficient consideration to Defendant's cooperation and risks taken as a result of cooperating.

11

Arguably, even in light of Defendant's cooperation, his actions were so vicious and depraved that an aggravated range sentence would have been appropriate given that Defendant had already been given very significant consideration for his cooperation by an agreement to a plea to third degree murder.

Moreover, the record otherwise also amply supports the reasonableness of the Court's low-end standard range sentence of 17-34 years for 3rd degree murder. According to his Prior Criminal History, Defendant was first adjudicated delinquent, at approximately age 12 for aggravated assault. [N.T. 1/6/14, at Ex. C-1]. Three years later, in 2000 he was again adjudicated delinquent for burglary, theft, and a violation of the Drug Act. [N.T. 1/6/14, at 3-4, Ex. C-1]. In 2002, Defendant pled guilty to two counts of robbery, criminal conspiracy, and a firearms charge. Based on his criminal history, Defendant's prior record score reflected his status as a Repeat Felony Offender (RFEL) which in turn triggers its own sentencing implications.

In addition, the record explicitly contradicts Defendant's claims that the Court did not properly weigh the impact of Defendant's horrendous childhood, cooperation with the Commonwealth, and the associated consequences of that cooperation. [N.T. 1/6/14, at 53-57]. While appellate courts generally presume a trial court with the benefit of a PSI is aware of relevant information and will weigh those considerations appropriately in light of mitigating factors, no such presumption is necessary in this case. *See Commonwealth v. Griffin*, 65 A.3d at 937; [N.T. 1/6/14, at 53-57]. Here, the Court acknowledged its review of the PSI, and expressly conveyed its conclusions that society as a whole failed Defendant who had now taken responsibility for his actions while simultaneously subjecting himself to significant danger by cooperating with authorities. [N.T. 1/6/14, at 53-57]; *See* supra pp. 5,

12

6, 7. In this case, the standard range sentence for the third-degree murder offense was 204-240 months (17-20 years), with a mitigated range sentence of 192 months (16 years); and the aggravated range being the maximum sentence of (20-40 years)).[17] Defendant has failed to advance the requisite colorable argument that the Court erred by imposing a low end standard range sentence for the third degree murder charge[18]. *See* 42 Pa. C. S. § 9781.

   *ii. The Low End Consecutive Standard Range Sentences Imposed Were Appropriate.*

Defendant's claim that the Court erred by considering impermissible facts gleaned from outside the record is similarly flawed. More particularly, with regard to those consecutive sentences imposed for robbery and solicitation to commit perjury, Defendant asserts that the Court erroneously relied on the recitation of facts set forth in the PSI, and as summarized in argument by the First Assistant District Attorney. Defendant contends that the only record of facts the Court should have considered is that which Defendant acknowledged as a factual basis for his guilty plea, which facts he characterizes as less egregious.[19] As discussed below, however, Defendant's argument is misplaced.

In this case, the Court's review and reliance upon the PSI was appropriate and, in fact, necessary to conduct a balanced and comprehensive analysis of the underlying sentencing factors. Indeed, absent a negotiated sentence, Courts are generally required to order a PSI when incarceration for one year or more is a possible disposition. Pa. R. Crim. P. 702(A); *Commonwealth v. Goggins*, 748 A.2d 721, 728 (Pa. Super. Ct. 2000). In *Goggins*,

---

[17] [N.T. 1/6/14, at 4-6].

[18] Defendant does not challenge the imposition of the low end standard range sentences on the other charges, but only that they were imposed consecutively.

[19] Defendant refers specifically to his plea to the robbery charge which he asserts was based on accomplice liability. [N.T. 8/1/12, at 12-13]. Regardless of Defendant's characterization, the criminal culpability for accomplice liability is identical to that of personal liability. *See* 18 Pa. C.S. § 306(a), (b).

13

the Superior Court reiterated our Supreme Court's specifications as to the essential elements of a PSI:

> To assure that the trial court imposes sentence in consideration of both "the particular circumstances of the offense and the character of the defendant," our Supreme Court has specified the minimum content of a PSI report. The "essential and adequate elements" of a PSI report include all of the following:
>
> (A) **a complete description of the offense and the circumstances surrounding it, not limited to aspects developed for the record as part of the determination of guilt**; . . . .

*Goggins*, 748 A.2d at 728. (emphasis added) (internal citations omitted).

As this Court previously noted in denying Defendant's Post-Sentence Motion, our Supreme Court has not only sanctioned the use of a complete description of the offense in the PSI, but has mandated its use by the Court to insure a thorough understanding of the crime for which a defendant is being sentenced. Implicit is the recognition that a guilty plea record will only reflect an admission to facts sufficient to support a defendant's acknowledgement that his actions meet the elements of the crime, which is precisely what transpired in the instant case.

To the extent that Defendant now asserts that the description of the robbery set forth in the PSI is factually inaccurate,[20] the Court in response undertook a review of the testimony from Defendant's Preliminary Hearing, as well as the Affidavit of Probable Cause, and Defendant's confession and Interview Record— all of which confirm the accuracy of the description of the robbery in the PSI, which provides as follows:[21]

---

[20] Defendant did not raise any objection at the sentencing hearing to either the First Assistant District Attorney's or the PSI's representation of the facts. In fact as to the PSI, when specifically asked by the Court if there were any objections, corrections, or additions to the PSI, Defense Counsel responded in the negative. [N.T. 1/6/14, at 5-6]. Had Defense Counsel asserted the facts were not accurate at that time, the Court would have been afforded the opportunity to investigate any alleged factual inaccuracy prior to imposing sentence.
[21] [N.T. 4/28/11, at 13-47]; [N.T. 1/6/14, at Ex. DS-1]; [N.T. 8/1/12, at Ex. D-2].

14

On October 14, 2010, the defendant reached through a driver side car window, shattered glass and grabbed the victim Taliya Davis. He threatened her with a gun touching the back of her head and struck her with it. He, along with another male demanded cash. They took her 9 mm pistol, a $50 bill and her cell phone. The defendant ripped open Taliya Davis' shirt and felt her chest. Another male arrived and stole her car.

[Ex. 1, ("PSI"), at 2]. Defendant's assertion that if the Court is limited to relying only on the factual basis of the guilty plea, Defendant can only be viewed as a passive participant is a perfect example of why a PSI is necessary to a complete understanding of the offense in question. Clearly Defendant was not an accomplice but the primary attacker in the robbery as accurately summarized in the PSI. The disturbing testimony provided by Taliya Davis at the Preliminary Hearing again reflects Defendant's cold, calculating modus operandi. Ms. Davis recalled the circumstances surrounding Defendant's violent attack as follows:

Q: What happened when you tried to leave?

A: When I was in the - - well, first, I had a bad feeling about something. So I didn't express that to them, but I told them I was going to the car because I was cold. So, when I was in the car, Bruce Woods, he decided to come to my side of the card [sic] . . . . I cracked the window to see what he had to say. Next thing I know, my window was being pulled on and shattered and broke.

Q: What do you mean it was being pulled and shattered and broke? Who did that?

A: Bruce Woods.

Q: What did he do after breaking your window?

A: Pulled my window, broke it, got me out of the car. There was a gun present.

Q: What do you mean a gun present?

A: He had a gun.

. . .

A: He had it to my back the whole time.

15

. . .

A: He pulled on my window, got me out of the car, had the gun to my back. It was a .45, all black .45 Magnum, all black .45.

. . .

A: . . . . Bruce had the gun to my back the whole time.

. . .

Q: What did they do to your clothes?

A: Like rip my shirt and feeling like I had something tucked, just feeling all on me.

. . .

A: He [Defendant] ripped my shirt.

. . .

A: Like he was feeling on me. He wasn't like feeling on me, but he did feel like I guess to see if I had anything tucked or whatever the case may be.

Q: Where did he touch you?

A: All over, like my chest and my pockets. Before I left – excuse me, let me backtrack. When I first got in the alleyway, he told me – he made a command and told me to take off my clothes. I guess by looking in my eyes, he could tell by looking, what do you mean take off my clothes? He made the comment, I don't need your pussy. I got my own.

Q: The defendant said that?

A: Yes, he did.

Q: How did this end?

A: After seeing I didn't have any money present, the defendant told me -- he told me to go the other way towards Swede Street . . . . But, before leaving, he like felt in my pants, in my drawers. It was like a ha-ha feeling. I don't know what that was about.

Q: Who touched you in your pants?

A: Bruce did.

[N.T. 4/28/11, at 15-20]. As set forth above, Defendant subjected Ms. Davis to a

terrifying robbery and a humiliating assault. And while the weapon stolen in that

robbery was allegedly the one used in the murder, the robbery of Ms. Davis was a

16

separate, distinct violent crime for which the Court's low end standard range sentence of 6-12 years of incarceration to run consecutive to his 3rd degree murder sentence was most appropriate.

With regard to the solicitation to commit perjury charge, Defendant claims that in imposing the sentence consecutively the Court relied upon an impermissible consideration—namely, that that charge involved perjury in the context of the grand jury process. Nothing in the record supports, let alone suggests, that the Court relied upon such an improper characterization in handing down its sentence. To the contrary, the Court's comments at sentencing were limited to the following statement "I think this Court has an obligation to send out a message that that [*i.e.*, subordination of perjury] will not be tolerated." [N.T. 1/6/14, at 56].

The facts this Court considered in sentencing Defendant on the solicitation to commit perjury were limited to Ms. Anderson's denial, at Defendant's direction, during the Preliminary Hearing of having ever seen Defendant with a firearm. Contrary to Ms. Anderson's denial, she had previously admitted[22] having seen Defendant in possession of a black handgun tucked into his waistband a matter of days before the murder. [N.T. 4/28/11, at 127-52, Ex. C-7 ("Statement")]. At his plea hearing, Defendant specifically acknowledged that same basis for his plea, as follows:

> Q: With regard to the crime of solicitation to commit perjury, . . . the elements of perjury involve Chanel Anderson, who made a false statement and testified under oath at your preliminary hearing in 2011, and that she knew her statement was false at the time, and that the statement was material to the proceeding during which it was made. The statement being whether or not she saw that you had a gun on the date of the homicide.

---

[22] Ms. Anderson's Statement was provided to Det. James McGowan on October 21, 2010.

17

[N.T. 8/1/12, at 10-11]. Similarly, the Affidavit admitted at Defendant's sentencing describes the factual predicate underlying solicitation as follows:

> On Thursday, October 21, 2010m Detectives McGowan and Minzola interviewed Chanel Anderson . . . . Anderson told investigators that on Sunday, October 17, 2010, she saw a black-handled handgun in Woods' waistband. Anderson viewed a photo of the Ruger handgun recovered . . . and said it looked like the gun she had seen in Woods' waistband that Sunday, two (2) days before this murder.

[N.T. 1/6/14, Ex. DS-1, Affidavit at 5-6]. The PSI states as follows:

> After the defendant's arrest for parole violation, he was incarcerated in Montgomery County Correctional Facility. In October and November 2010, detectives surreptitiously placed a mobile phone among the inmates at Montgomery County Correctional Facility. Numerous inmates including the defendant used the phone which was being wiretapped. During some of the recorded conversations, the defendant solicited individuals to commit perjury regarding potential testimony in the murder case and deliver contraband to him. . . . On November 4, 2010, the defendant solicited Chanel Anderson via phone to influence her testimony in his favor before the Grand Jury.

[Ex. 1, ("PSI"), at 2]. And while the PSI does inaccurately mention the solicitation charge in the context of tainting the grand jury proceeding, it also generally states that Defendant solicited "individuals to commit perjury regarding potential testimony in the murder case . . . ." [Id.]. In sentencing Defendant for the solicitation to commit perjury this Court relied only upon the fact that Defendant solicited Anderson's perjury. The proceeding at which the perjury took place was of no significance to the sentence imposed. The solicitation of perjury of a witness in any case is an attack on our judicial process that cannot be tolerated. In the context of the instant case, the solicitation was of a witness who was to testify involving Defendant's cold-blooded murder of a witness, circumstances which clearly dictated that the crime be treated as its own distinct crime for which a consecutive sentence is most appropriate. *See* Pa. R. Crim. P. 702(A); *Goggins*, 748 A.2d at 728.

18

For his part and in support of his claim Defendant relies on several cases—all of which are inapposite and distinguishable. First, Defendant cites *Commonwealth v. Cortez*, wherein he claims that that appellate court vacated the trial court's sentence after determining that the record did not support its sentence. *Commonwealth v. Cortez*, 860 A. 2d 1045 (Pa. Super. Ct. 2004), vac'd, 934 A. 2d 1151 (Pa. 2007). The trial court's sentence was based in part on an allegedly impermissible consideration— namely, its assessment that the defendant was "spreading his cancer throughout many neighborhoods and families . . ."[23] In citing and relying upon *Cortez*, Defendant fails to properly acknowledge that the Pennsylvania Supreme Court ultimately granted allocator and vacated the Superior Court's decision upon which Defendant relies.[24] Given its procedural history and its distinct factual underpinnings, this Court finds Defendant's reliance on *Cortez* unpersuasive.

Defendant's reliance on *Commonwealth v. McAfee* is similarly misplaced.[25] There, the Superior Court upheld the trial court's sentence, concluding there was "no indication that the trial court applied improper factors when imposing sentence, that the trial court relied on incorrect information or that the trial court acted out of prejudice toward Appellant." *McAfee*, 849 A.2d at 277. It further elucidated its analysis, stating that the trial court "was not limited to a consideration of only the most recent events in Appellant's history," and that "[i]t was not an abuse of discretion for the trial judge to review the entirety of the Supervision History submitted at the hearing by the Pennsylvania Department of Probation

---

[23] *Commonwealth v. Cortez*, 860 A.2d 1045, 1049 (Pa. Super. Ct. 2004) (Appeal granted and Order Vacated by 934 A. 2d 1151 (Pa. 2007).

[24] *Commonwealth v. Cortez*, 934 A. 2d 1151 (Pa. 2007) ("This matter is REMANDED for reconsideration . in light of our decision in *Commonwealth v. Walls*, 592 Pa. 557, 926 A.2d 957 (2007) [(Vacating the Superior Court's decision after concluding it, among other things, had impermissibly characterized the trial court's sentencing decision and reweighed the reasons offered by the sentencing court.) and *Commonwealth v. Whitmore*, 590 Pa. 376, 912 A.2d 827 (2006)[(Reversing the Superior Court's decision and holding that the Superior Court did not have authority to *sua sponte* order a new judge to preside over resentencing despite that Court's conclusion that sentencing court had improperly weighed certain factors.)]."

[25] *Commonwealth v. McAfee*, 849 A. 2d 270 (Pa. Super. Ct. 2004).

19

and Parole when sentencing Appellant." *Id.* at 276. Moreover, in *McAfee*, the specific issue addressed by the appellate court was whether "the trial court abused its discretion by re-sentencing Appellant after a violation of probation hearing, to a sentence of total confinement where Appellant did not violate any 'stay away' orders, and where allegations of assault were specious and never proven by a criminal conviction." *Id.* at 274. Unlike *McAfee*, where the underlying assault charges were dismissed, in the instant case, Defendant plead guilty to the underlying robbery and simple assault of Taliya Davis, and therefore, the Court properly relied upon his criminal culpability in crafting its sentence. *See id.* at 273.

In *Commonwealth v. Bethea*, also relied upon by Defendant, the record indicated that the trial court may have imposed an augmented sentence as a consequence for defendant's decision to go to trial rather than plead guilty.[26] Despite the fact that Defendant here pled guilty, and the instant concomitant factual incongruity from *Bethea* where the defendant refused to plead guilty, the Court will briefly address *Bethea* so as to further clarify its inapplicability and put Defendant's reliance on it to rest. At the time of sentencing, the Judge in *Bethea* uttered the following reproach to the defendant, "Well Gerald, it's a great shame . . . . had you pled guilty it might have shown me the right side of your attitude about this, but you pled not guilty, fought it all the way, and the jury found you guilty, and I'm going to sentence you at this time." *Id.* at 105-06. While the Superior Court affirmed, the Supreme Court ultimately vacated the sentence and remanded for resentencing, stating that "[a]ny increase in sentence which results from a defendant's decision to put the state to its proof puts a price upon the exercise of a fundamental constitutional right, and hence is unjustified." *Id.* at 106. The instant case involves no such improper considerations, as Defendant pled guilty, and therefore, this Court's sentence does not invoke the analysis regarding one's 6th

---

[26] *Commonwealth v. Bethea*, 379 A.2d 102 (Pa. 1977).

20

Amendment rights conducted by the Court in *Bethea*.[27] Furthermore, the record demonstrates that the sentences imposed here, which were in the low-end of the standard range, were wholly reasonable given all of the circumstances thoroughly discussed *supra*.

The remaining cases relied upon by Defendant are similarly inapplicable, and/or actually support the sentence imposed by the Court. *See e.g., Commonwealth v. Charles*, 488 A.2d 1126, 1132 (Pa. Super. Ct. 1985) (Affirming trial court's sentence after concluding that the defense failed to meet its burden of demonstrating that the presentence report included reference to invalid convictions and was therefore, inaccurate.); *Commonwealth v. Klueber*, 904 A.2d 911 (Pa. 2006) (Reversing the appellate court's decision which vacated the trial court's imposition of 134 consecutive sentences on all 134 counts.); *Commonwealth v. Berrigan*, 535 A.2d 91, 106 (Pa. Super. Ct. 1987)(Sentences vacated where appellate court determined that the trial judge, the Honorable Samuel W. Salus, II, had "apparently relied on an allegation of uncertain origin" which defendants had no opportunity to contest.); *Commonwealth v. Smithton*, (Pa. Super. Ct. 1993) ("It is not enough that a trial court simply *entertained* impermissible evidence in its deliberations. A court is 'ordinarily presumed to be capable of identifying and properly disregarding all but the most prejudicial and inflammatory evidence.' . . .) (internal citations omitted).

Having failed to advance a colorable argument that his low end standard range sentences were inappropriate under the Sentencing Code, Defendant's challenge to the discretionary aspects of his sentence is meritless. In light of the multitude of compelling factors regarding this Defendant's background, the depravity of his acts, and the consideration afforded him in his plea deal for his cooperation, all of which were thoroughly

---

[27] U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . ."); Pa. Const. art. I, § 6 ("Trial by jury shall be as heretofore, and the right thereof remain inviolate.").

21

analyzed and considered by the Court in fashioning the sentence as explained in this opinion, the Court's sentence was wholly appropriate.

## V. CONCLUSION

Accordingly, the Court respectfully requests that the judgment of sentence imposed on Defendant, Bruce Woods, on January 6, 2014, be AFFIRMED.

BY THE COURT:

THOMAS C. BRANCA,                    J.

Copies of the above Opinion
Mailed on:*12/16*/14
**By First Class Mail:**
Stephen Heckman, Esquire
Carol A. Sweeney, Esquire
**By Interoffice Mail:**
Montgomery County District Attorney - Appellate Division
        Robert M. Falin, Esquire, Chief
Deputy Court Administrator-Criminal

Secretary

22